**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT BILHORN and ADEEL KHAN individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JAGUAR LAND ROVER NORTH AMERICA, LLC and JAGUAR LAND ROVER LIMITED, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Robert Bilhorn and Adeel Khan bring this action against Defendants Jaguar Land Rover North America, LLC ("JLRNA") and Jaguar Land Rover Limited ("JLR Limited" and, collectively with JLRNA, "JLR" or "Defendants"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

**INTRODUCTION**

1. This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of MY 2020-23 Land Rover Defender vehicles ("Class Vehicles") equipped with headlight assemblies that incorporate defective light-emitting diode daytime running lights ("DRL").

2. This action arises from JLR's refusal to disclose to Plaintiffs and similarly situated consumers that Class Vehicles incorporate defective headlight assemblies that fail prematurely and well in advance of their expected useful life ("the Defect"). LED lights, like the DRLs here at issue, are intended and expected to function for years and tens of thousands of driving hours. Yet,

1

the DRLs equipped in Class Vehicles fail shortly after purchase, typically within the term of JLR's New Vehicle Limited Warranty ("NVLW") or shortly thereafter.

3. The Defect poses a significant safety risk to the operators and passengers of Class Vehicles, including that is causes reduced vehicle conspicuity during dawn, dusk, inclement weather, and other low-visibility driving conditions.

4. Automotive manufacturers like JLR equip DRLs in vehicles to, among other things, ensure the safety of drivers and other motorists during vehicle operation by increasing vehicle visibility to reduce the risk of collisions during both ordinary and inclement weather. Indeed, many countries mandate that vehicle manufacturers like JLR equip DRLs on all vehicles.

5. Because the Defect inhibits the functionality of this critical safety feature, the Defect renders Class Vehicles unsuited for the ordinary and intended purpose of providing safe and reliable transportation.

6. Adding insult to injury, JLR does not make available for Class Vehicles replacement "halo-style" DRLs as standalone components. To restore functionality to this critical safety feature when the Defect inevitably manifests, vehicle owners must replace the entire headlight assembly at a retail cost of approximately $3,000 to $4,000 exclusive of labor, programming, taxes, and diagnostic charges—even when the assemblies' other components remain operational.

7. Regardless of whether JLR agrees to provide warranty or goodwill coverage for the repairs, JLR replaces failed headlight assemblies with identically and inherently defective headlight assemblies guaranteed to fail during the Class Vehicles' useful life.

8. JLR has long known of the Defect, as evidenced by its apparent efforts to revise the design of the DRL equipped in later model year Defender vehicles. However, there is no indication

that the revised design resolves the underlying issue such that JLR has permanently "fixed" or otherwise remedied the Defect.

9. Accordingly, JLR's decision to "remedy" the Defect in in-warranty Class Vehicles using identically defective replacement parts deprives Class members of the warranty coverage for which they bargained when purchasing their vehicles. Because replacement assemblies contain the same or substantially similar defective components, replacement assemblies are likewise prone to premature failure.

10. Further, JLR's failure to provide an effective in-warranty "fix" instead ensures all Class members eventually will pay out of pocket to correct the Defect, regardless of whether it first manifests during the warranty period. Accordingly, JLR's NVLW both fails its essential purpose and renders the NVLW's durational limitations unconscionable.

11. On information and belief, prior to sale or lease of the Vehicles at issue, JLR learned of the Defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made directly to JLR, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from JLR dealers; and other internal sources.

12. Despite this knowledge, JLR has refused—and continues to refuse—to disclose the Defect to prospective customers, and actively concealed the Defect from Plaintiffs and Class members prior to and at the time of sale while marketing and advertising Class Vehicles as safe and reliable, which they are not.

3

13.    JLR has refused and continues to refuse to acknowledge, prior to and at the time of sale, that Class Vehicles eventually will require costly repairs and that the Defect reduced the value of the Class Vehicles, both at the time of sale and any future resale.

14.    In short, JLR's unfair, deceptive, and/or fraudulent business practices have caused current and former owners and/or lessees of Class Vehicles to suffer an ascertainable loss of money, property, and/or loss in value. The unfair and deceptive trade practices JLR committed were undertaken in a manner giving rise to substantial aggravating circumstances.

15.    Had Plaintiffs and Class members known of the Defect at the time of purchase, including the safety hazard the Defect poses and out-of-pocket repair costs it eventually will require, they would have paid much less for the Class Vehicles, or would not have purchased Class Vehicles and avoided these expenses altogether.

16.    Plaintiffs and Class members also lost the benefit of their bargain because Class Vehicles were worth less at the time of sale than represented. As such, Plaintiffs and Class members have not received the value for which they bargained when they purchased their Class Vehicles.

17.    Consumers purchasing premium luxury SUVs reasonably expect that expensive integrated lighting systems will not require complete replacement shortly after expiration of the warranty period. The Defect therefore materially reduced the value of Class Vehicles at the time of sale.

18.    Accordingly, Plaintiffs bring this action to redress JLR's violations of consumer protection statutes and the Magnuson-Moss Warranty Act, and JLR's breaches of express and implied warranties.

4

**PARTIES**

19.     Plaintiff Robert Bilhorn is a citizen of the State of California, and currently resides in Escondido, California.

20.     Plaintiff Adeel Khan is a citizen of the State of Illinois and currently resides in Bolingbrook, Illinois.

21.     Defendant JLR Limited is a private limited company organized under the laws of the United Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF, England.

22.     JLR Limited is the operating company of Jaguar Land Rover PLC, which, upon information and belief, is organized under the laws of the United Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF, England.

23.     Jaguar Land Rover PLC oversees the management strategy, operation, and risks facing Defendants, including those relating to Class Vehicles,[1] whereas JLR Limited designs, develops and manufactures Land Rover vehicles, including Class Vehicles.[2]

24.     JLR Limited's "Board of Directors has ultimate responsibility for . . . risk management" and its "Risk and Compliance Committee" oversees "current and emerging risks and monitor[s] the progress of remediation actions towards acceptable levels of control and exposure." Principal risks and exceptions are reported by JLR LTD to the Audit Committee and

---

[1] *Jaguar Land Rover Automotive PLC Annual Report FY 23/24*, available at https://media.production.jlrms.com/2024-06-03/pdf/c6e366ad-90f9-4e85-a034-fd58c68be68b/Annual%20Report%202024%20Document%20Final.pdf?VersionId=J0e5szaNJz.1tPJVS9DQkiadIB eifJsO (last visited July 1, 2026).
[2] *Rains v. Jaguar Land Rover N. Amer.*, Case No. 22-cv-4370 (D.N.J., filed June 30, 2022), Dkt. No. 96-2, Decl. of Maria E. Martinez, General Counsel for Litigation and Regulatory Affairs for JLR Limited ("Martinez Decl."), ¶6.

JLR PLC's Board of Directors "regularly to assist in the decision-making process and ensure adequate controls are in place to provide sufficient protection to the organisation."[3]

25.     In addition, JLR Limited's Board executes Defendants' "strategy and ensures the governance principles agree with the [JLR PLC's] Board of Directors, with the [JLR Limited] Board operating under the direction and authority of the Chief Executive Officer to support in the execution of the [JLR PLC and its subsidiaries'] strategy, including evaluating [their] performance against budget and forecast."[4]

26.     The [JLR Limited] Board is also responsible for overseeing the implementation of appropriate risk assessment processes and controls to identify, manage and mitigate the principal risks to the [Defendants], and in doing so, provide support to the boards of directors of other Group companies."[5]

27.     JLR Limited sells Jaguar- and Land Rover-brand vehicles (including Class Vehicles) in the United States through its wholly owned subsidiary and sole U.S. distributor, Defendant Jaguar Land Rover North America, LLC ("JLRNA").[6] All Class Vehicles manufactured, developed and designed by Land Rover Limited that ended up in the United States did so as a result of JLRNA's relationship with Land Rover Limited and its role as the American based storefront for Land Rover Limited.

---

[3] *Jaguar Land Rover Automotive PLC Annual Report FY 23/24*, available at https://media.production.jlrms.com/2024-06-03/pdf/c6e366ad-90f9-4e85-a034-fd58c68be68b/Annual%20Report%202024%20Document%20Final.pdf?VersionId=J0e5szaNJz.1tPJVS9DQkiadIB eifJsO (last visited July 1, 2026).

[4] *Id.*

[5] *Id.*

[6] *Id.* at 149; https://www.tatamotors.com/wp-content/uploads/2023/10/Jaguar-Land-Rover-North-America-LLC.pdf (last visited July 1, 2026)..

28.     JLRNA maintains its corporate headquarters and principal place of business at 100 Jaguar Land Rover Way, Mahwah, New Jersey 07495.

29.     In a 2016 announcement regarding the expansion of JLRNA's Mahwah-based headquarters, Defendants described "Jaguar Land Rover, North America" as "the Mahwah-based arm of British premium automaker Jaguar Land Rover Limited" and Mahwah as "the site of its new North American headquarters."[7] The announcement further notes that JLRNA employees in New Jersey "manage[ ] the automaker's business in the United States and Canada…."[8]

30.     JLR Limited communicates with Defendant JLRNA concerning virtually all aspects of the Land Rover-brand vehicles it distributes across the United States, including appropriate repairs for pervasive defects, and whether JLR will cover repairs to parts and assemblies that customers claim to be defective.

31.     As part of its ordinary operations, JLR Limited received material information concerning the existence of the Defect from JLRNA. Defendants review and analyze warranty data collected and submitted by JLRNA and Land Rover-authorized dealerships and technicians throughout the United States and the world to identify defect trends in vehicles. Upon information and belief, Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), authorized service centers must provide JLRNA and Land Rover Limited with detailed documentation that describes the complaint, the parts that failed, the cause of the failure and its correction, and also save the broken part in the event Defendants elect to audit the dealership or

---

[7] https://media.jaguarlandrover.com/en-us/news/2016/09/jaguar-land-rover-expands-new-jersey-presence-move-north-american-headquarters-new#:~:text=%E2%80%9CTo%20accommodate%20our%20growing%20business,Land%20Rover%20North%20A merica%2C%20LLC (last visited July 1, 2026).

[8] *Id.*

further investigate the failure. Defendants use this information to assess whether particular repairs are covered by an applicable Land Rover warranty and/or are indicative of a pervasive defect.

32. JLR's decision to neither disclose the Defect to Plaintiffs or the Class nor cover repairs to the same pursuant to an extended warranty or goodwill program therefore was a decision made jointly by Defendants.

33. Upon information and belief, Defendants JLR limited and JLRNA also jointly developed the owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles, and jointly design, determine the substance of, and affix to JLR vehicles the window stickers visible on every new JLR vehicle offered for sale at its authorized dealerships, including those omitting mention of the Defect and reviewed by Plaintiffs prior to purchasing Class Vehicles.

34. JLR controls the content of these window stickers; its authorized dealerships have no input with respect to their content. Vehicle manufacturers like JLR are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231-1233, et seq. In fact, the Act specifically prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

35. At all relevant times, JLRNA acted as the authorized agent, representative, servant, employee and/or alter ego of JLR Limited while performing activities in the United States including but not limited to advertising, issuing and overseeing warranties, warranty repairs, dissemination of technical information and monitoring the performance of Land Rover vehicles in the United States, including substantial activities that occurred within this jurisdiction.

36.     Accordingly, at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of the other Defendant, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of the other Defendant. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, the other Defendants.

37.     There thus exists, and at all times herein mentioned existed, a unity of ownership between each Defendant and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants and each of them, would, under the circumstances set forth in this Complaint, sanction fraud or promote injustice. JLR Limited and JLR NA thus are collectively referred to in this complaint as "Defendants" or "JLR" unless identified separately.

## PLAINTIFF BILHORN'S EXPERIENCE

38.     In October 2021, Plaintiff Bilhorn purchased for personal, family and/or household uses a new 2022 Land Rover Defender from Land Rover Carlsbad, an authorized JLR dealer located in Carlsbad, CA. His vehicle bears the following VIN: SALEY6RU8N2084239. Plaintiff paid approximately $80,000 for his Land Rover Defender, exclusive of taxes.

39.     Prior to purchasing his Class Vehicle, Plaintiff Bilhorn viewed advertisements for the vehicle and the vehicle's window sticker, test drove the vehicle and spoke with JLR sales representatives concerning the vehicle's features.

40.     Safety, reliability, and premium build quality were important factors in Plaintiff Bilhorn's decision to purchase the Class Vehicle. Plaintiff purchased the vehicle in part because JLR marketed the Defender as a premium luxury SUV equipped with advanced safety features, including LED lighting systems designed to improve visibility and roadway safety.

9

41.     Plaintiff reasonably expected that critical safety-related lighting components would function reliably for the useful life of the vehicle and would not require multi-thousand-dollar repairs after only a few years of ordinary use.

42.     The existence of functioning LED DRLs was material to Plaintiff's purchasing decision because DRLs are a critical safety feature designed to increase vehicle visibility and reduce collisions.

43.     Had Plaintiff known that the DRLs equipped in Class Vehicles were defective and prone to premature failure requiring replacement of the entire headlight assembly, Plaintiff would not have purchased the vehicle or would have paid substantially less for it.

44.     In addition to touting many of the Class Vehicle's features, the window sticker also touted the vehicle's safety features—including the existence and functionality of LED DRLs—and stated that the vehicle was covered by JLR's New Vehicle Limited Warranty.

45.     In February 2026, with approximately 47,000 miles on the odometer, the passenger-side LED DRL equipped in Plaintiff Bilhorn's Class Vehicle failed suddenly and without warning.

46.     Plaintiff Bilhorn subsequently brought the vehicle into the dealership, and he was informed that his vehicle was out of JLR's 50,000-mile/4-year NVLW and quoted him a repair cost of $3,000 to replace the entire light assembly. Plaintiff was shocked to learn that a basic safety-related lighting failure required replacement of the entire headlight assembly at enormous cost.

47.     Due to the exorbitant repair estimate he received, Plaintiff Bilhorn attempted to repair the broken DRL himself. He ultimately did so by purchasing a new OEM LED module at his own expense, disassembling his failed headlight assembly, and replacing the LED module equipped therein. Plaintiff Bilhorn estimates he spent four hours effecting these repairs despite the fact he is a trained engineer. The repairs restored functionality to the passenger-side DRL in his

Class Vehicle, but he cannot be certain those repairs have cured the Defect permanently. Based on what Plaintiff Bilhorn has learned regarding the Defect, he reasonably anticipates that the driver-side DRL also may fail prematurely.

48.    Neither Defendant, nor its agents, dealers, or other representatives informed Plaintiff Bilhorn of the Defect's existence at any time, either prior to or following his purchase, whether at the point of sale or otherwise.

49.    Plaintiff Bilhorn has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the monies spent purchasing a replacement LED module and the approximately four hours he spent attempting to repair the Defect, as well as the diminished value of his vehicle. Had JLR refrained from making the misrepresentations and omissions alleged herein, Plaintiff Bilhorn would not have purchased a Class Vehicle, or would have paid materially less for it. Plaintiff Bilhorn also suffered loss of use, lost time, inconvenience, and diminution in resale value.

50.    Plaintiff has lost confidence in JLR's representations concerning the safety and reliability of Class Vehicles. Until JLR fully discloses the Defect and implements a permanent repair, Plaintiff cannot rely on JLR's advertising or representations concerning its vehicles in the future, and therefore would not purchase another Class Vehicle despite otherwise being interested in doing so.

**PLAINTIFF KHAN'S EXPERIENCE**

51.    In September 2025, Plaintiff Khan purchased for personal, family, and/or household uses a certified pre-owned 2022 Land Rover Defender with 53,301 miles on the odometer from Jaguar Land Rover Hinsdale, an authorized JLR dealer located in Hinsdale, IL. Plaintiff Khan paid

11

approximately $50,000, exclusive of taxes and fees. His vehicle bears the following VIN: SALE37RU5N2095512.

52.     Prior to purchasing his Class Vehicle, Plaintiff Khan viewed advertisements for the vehicle and the vehicle's window sticker, test drove the vehicle and spoke with JLR sales representatives concerning the vehicle's features.

53.     Safety, reliability, and premium build quality were important factors in Plaintiff Khan's decision to purchase the Class Vehicle. Plaintiff purchased the vehicle in part because JLR marketed the Defender as a premium luxury SUV equipped with advanced safety features, including LED lighting systems designed to improve visibility and roadway safety.

54.     Plaintiff reasonably expected that critical safety-related lighting components would function reliably for the useful life of the vehicle and would not require multi-thousand-dollar repairs after only a few years of ordinary use.

55.     The existence of functioning LED DRLs was material to Plaintiff's purchasing decision because DRLs are a critical safety feature designed to increase vehicle visibility and reduce collisions.

56.     Had Plaintiff known that the DRLs equipped in Class Vehicles were defective and prone to premature failure requiring replacement of the entire headlight assembly, Plaintiff would not have purchased the vehicle or would have paid substantially less for it.

57.     In addition to touting many of the Class Vehicle's features, the window sticker also touted the vehicle's safety features—including the existence and functionality of LED DRLs.

58.     In November 2025, with approximately 55,000 miles on the odometer, the driver-side LED DRL equipped on Plaintiff Khan's Class Vehicle failed suddenly and without warning.

59.    Plaintiff Khan subsequently brought the vehicle back to Land Rover Hinsdale, where service personnel informed him that because his Vehicle's 50,000-mile/4-year NVLW had expired he would need to pay approximately $3,000 to restore functionality to his DRL by replacing the entire light assembly.  Plaintiff Khan learned that the LED DRL could not be serviced independently and that replacement of the entire headlight assembly was required. Plaintiff Khan refused the repair due to the excessive costs involved.

60.    Neither Defendant, nor its agents, dealers, or other representatives informed Plaintiff Khan of the Defect's existence at any time, either prior to or following his purchase, whether at the point of sale or otherwise.

61.    Plaintiff Khan no longer trusts the vehicle to provide safe, dependable, and reliable transportation. Plaintiff Khan has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the diminished value of his vehicle. Had JLR refrained from making the misrepresentations and omissions alleged herein, Plaintiff Khan would not have purchased a Class Vehicle, or would have paid materially less for it.

62.    Plaintiff Khan has lost confidence in JLR's representations concerning the safety and reliability of Class Vehicles. Until JLR fully discloses the Defect and implements a permanent repair, Plaintiff Khan cannot rely on JLR's advertising or representations concerning its vehicles in the future, and therefore would not purchase another Class Vehicle despite otherwise being interested in doing so.

## JURISDICTION AND VENUE

63.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members,

13

(ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

64. Jurisdiction exists over JLRNA because it is headquartered in this District.

65. Jurisdiction also exists over JLR Limited. JLR Limited's principal activity is the design, development, manufacture of Class Vehicles, all of which are distributed and sold through its wholly-owned subsidiary and sole U.S. "arm," JLRNA, which is headquartered in this district. Through its direction of JLRNA, JLR Limited transacts substantial business in this District, namely the distribution, sale, and servicing of, and provision of warranty coverage for, Class Vehicles, with the goal of maximizing the financial performance of JLR Limited. Indeed, more than 20% of the vehicles designed and manufactured by JLR Limited are sold in North America. JLR thus has sufficient minimum contacts with this District.

66. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because JLR is headquartered in and/or transact business in this district, are subject to personal jurisdiction in this district, have advertised in this district, and have received substantial revenue and profits from sales and leases of Class Vehicles in this district.

**FACTUAL ALLEGATIONS**

**A.    The Defect**

67. JLR is a multinational corporation with hundreds of thousands of employees worldwide.

14

68.     The Land Rover Defender, the vehicle model at the heart of this litigation, has been manufactured since 1948, and remains Land Rover's most popular offering. On information and belief, JLR has sold more than 60,000 Class Vehicles in the United States.[9]

69.     Class Vehicles were sold in four sub-models of varying sizes, passenger capacity, and engine options at prices ranging from approximately $63,500 to $181,825.[10]

70.     Consumers pay a substantial premium for Class Vehicles because JLR markets the Defender as a durable, technologically advanced luxury SUV engineered for reliability and safety in demanding driving conditions. Those representations were materially misleading because the Class Vehicles contain defective lighting components prone to premature failure during ordinary use.

71.     Consumers reasonably rely on vehicle manufacturers to ensure that critical visibility and lighting systems function reliably because failures in those systems can increase the risk of collisions involving vehicle occupants, pedestrians, bicyclists, and other motorists.

72.     Every Class Vehicle comes equipped with identical "halo"-style LED DRLs.

---

[9] https://www.goodcarbadcar.net/land-rover-defender-sales-figures/ (last visited July 1, 2026).
[10] https://www.landroverusa.com/defender/index.html (last visited July 1, 2026).



Figure 1: Photo of the "halo" DRL on the passenger-side headlight assembly of a Land Rover Defender vehicle.

73.    The circular "halo" DRLs on the Defenders are considered iconic to the Defender and buyers identify the "mean" or "tough" look the DRLs provide as one of the reasons they selected the Class Vehicles over competitors.[11]

74.    However, the LED DRLs equipped in Class Vehicles are not merely aesthetic features. They are federally recognized safety components designed to increase vehicle

---

[11] https://landroverforums.com/forum/2020-defender-60/premium-led-headlight-failures-jlr-actions-117220/page2/ (last visited July 1, 2026).

16

conspicuity and reduce collisions by making vehicles more visible to other motorists during daylight and low-visibility conditions.

75.    Class Vehicle's LED DRLs fulfill a critical safety function. DRLs increase the visibility of the vehicles in which they are equipped to make it easier for other motorists to identify other vehicles on the road, reducing the risk of daytime collisions, and to provide additional lighting during inclement weather for improved visibility.

76.    DRLs also enhance vehicle safety on winding roads in forests or mountainous areas in which visibility is lower even during the daytime, and in which motorists are less likely to spot oncoming traffic.

77.    One 2019 study concluded that DRLs reduce the risk of accidents by 8.8%.[12]

78.    JLR itself recognizes that DRLs are essential to vehicle safety. For example, JLR's authorized dealers advise that a DRL failure "is a safety issue, and [vehicle owners] should get it taken care of as soon as possible."[13] Other dealers have acknowledged that DRLs help "provide optimal visibility in various driving conditions, from pitch-black country roads to busy urban streets."[14]

79.    Unlike ordinary headlights, DRL failures may not be immediately apparent to drivers because DRLs primarily function to increase visibility of the vehicle to others rather than illuminate the roadway itself. As a result, drivers may unknowingly operate Class Vehicles for extended periods with failed DRLs, increasing the risk of accidents.

---

[12] https://www.carexpert.com.au/car-news/do-daytime-running-lights-improve-road-safety (last visited July 1, 2026).

[13] https://www.landrovernorthatlanta.com/dashboard-lights-guide.htm?srsltid=AfmBOooWrlr2IwePMHTsUcqEiaGnCTg4ztS7vkJ_EvTTuyukSh3dope9 (last visited July 1, 2026).

[14] https://www.landroverofrichmond.com/tools-resources/2018-discovery-sport-headlights-illuminating-the-path-of-innovation (last visited July 1, 2026).

80.     JLR thus markets the presence of functioning DRLs in Class Vehicles by prominently identifying them as standard features on the window stickers affixed to every Class Vehicle at the time of sale:



Figure 2: Original Window Sticker for a 2020 Land Rover Defender.[15]

81.     Reasonable consumers purchasing premium luxury SUVs such as Class Vehicles expect that critical safety-related lighting systems will function reliably for the useful life of the vehicle and will not require multi-thousand-dollar repairs after only a few years of ordinary use.

---

[15] https://www.defendersource.com/threads/finding-the-original-window-sticker-for-2020-land-rover-defender.175023/ (last visited July 1, 2026).

82. JLR intended the DRLs in Class vehicle to remain illuminated whenever Class Vehicles are in operation and selected LED lights for use therein due to their longevity.

83. LED lights should, are expected to, and typically do last 30,000 to 40,000 hours, or the approximate expected lifespan of a car.[16] The longevity of LED lights is what makes them particularly well-suited for use in DRLs, which remain illuminated during vehicle operation.

84. For example, according to the Federal Highway Administration the average US driver drives their vehicle approximately 13,476 miles annually.[17] Conservatively assuming that drivers average 30 MPH during vehicle operation, the average driver spends approximately 449 hours in her vehicle annually, which implies LED DRLs should last at least 66.7 years, significantly longer than the expected lifespan of a vehicle.

85. Even if an LED provided a lifespan of only 10,000 hours, LED DRLs would still last more than 22 years—well beyond Class Vehicles' expected useful life.

86. The LED DRLs JLR equipped in Class Vehicles, however, uniformly fail within two to five years of purchase, evincing a defect in materials, workmanship, and/or design.

87. The dramatic disparity between the expected lifespan of properly designed LED DRLs and the actual lifespan of the DRLs equipped in Class Vehicles further evidences a defect in materials, workmanship, and/or design.

88. Below is a screenshot of one of the many Class Vehicles that has experienced DRL failure, in this case on the driver's side:

---

[16] https://www.micksgarage.com/blog/complete-guide-car-headlights (last visited July 1, 2026).
[17] https://www.fhwa.dot.gov/ohim/onh00/bar8.htm (last visited July 1, 2026).



Figure 3: DRL failure on 2020 Land Rover Defender.[18]

89.    The LED DRLs equipped in Class Vehicles fail when they *never* should due to a defect in materials, workmanship and/or design that renders the DRLs unable to withstand the thermal stress to which they are exposed during ordinary and expected vehicle operation.

90.    Although LEDs run cooler than older halogen lights, they still require adequate cooling of their electronic components. This typically is accomplished through the use of a heat sink, a component that serves as a passive heat exchanger, absorbing and dissipating thermal energy away from electronic or mechanical devices into the surrounding air to prevent overheating and ensure components survive through their expected useful life. Automotive LED assemblies use heat sinks to prevent the LED diodes from overheating, which causes premature failure, reduced brightness, and color shifting.

91.    The Defect in Class Vehicle DRLs arises from JLR's failure to use suitable subcomponents and properly assemble the DRL. Specifically, JLR manufactured the Headlight

---

[18] https://landroverforums.com/forum/2020-defender-60/led-drl-not-turning-only-regular-headlights-planned-jlr-122769/ (last visited July 1, 2026).

Assemblies with defective LED control modules—the electronic "brain" that activates and operates the DRL halo ring when the vehicle is on—that are incapable of sufficient thermal conductivity. The modules thus overheat, leading the DRLs to fail prematurely as described herein.

92.    In Class Vehicles, the rear of the DRL control module to which a heatsink is attached is covered by a solder mask, a protective coating applied to a printed circuit board in order to facilitate labeling, such as part numbers. Including the solder mask between the DRL module and the heat sink—as opposed to, for example, using a metal backing on the module—impedes heat transfer to the heat sink, causing the module and the LED DRL light matrix to burn out due to insufficient heat dissipation.



Figure 4: Photo of LED Module and its heatsink assembly.



Figure 5: Photo of the LED Module covered with the solder mask versus how it should be in bare copper for proper heat dissipation.



Figure 6: Photo of the LED Module with thermal compound applied to the heat sink mating surface for proper heat dissipation.

93.    These shortcomings are amplified by JLR's failure to apply a thermal compound between the heatsink and the DRL control module. A thermal compound is a substance used to improve heat transfer between two surfaces, including between an electronic component and a heatsink. Its main purpose is to fill microscopic air gaps that naturally occur between the surfaces, because air is a poor conductor of heat. Applying a thermal compound between heatsinks and electronic components is a standard engineering practice that ensures proper contact and heat transfer, to compensate for the inherent roughness on the surface of heatsinks. JLR's failure to

22

utilize a thermal compound when assembling the LED DRLs and headlight assemblies in Class Vehicles exacerbated the engineering failures inherent in the DRL control module and discussed above.

94.    In short, the defects in materials, workmanship, and or/design described herein cause the LED DRLs in Class Vehicle to overheat and fail prematurely.

95.    Adding insult to injury, once Class members experience DRL failure they must replace *the entire headlight assembly* into which the DRLs are incorporated. Class Vehicle DRLs are not a standalone component, nor are they sold separately. The LED DRLs are an embedded component in the Class Vehicles' headlight assemblies.



23

Figure 7: Diagram of the $4,010.45 left-side headlight assembly (JLR Part Number LR181381).[19]

96.    One the DRLs fail in Class Vehicles, customers are informed they must replace the *entire* assembly at a cost of as much as $4,000, *just for the part itself*.[20]

97.    Because the DRLs are integrated into the headlight assembly, consumers cannot replace a simple bulb or inexpensive standalone component.

**B.    JLR's Longstanding Knowledge of the Defect**

98.    On information and belief, JLR learned of the Defect at least as early as 2020, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through sources such as pre-release evaluation and testing; internal repair and replacement part sales data; early consumer complaints made directly to JLR, collected by NHTSA ODI, and/or posted on public online vehicle owner forums monitored by Defendants; testing done in response to those complaints; aggregate data from JLR dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

99.    The volume and consistency of complaints concerning identical failures across multiple model years further confirmed the systemic nature of the Defect.

**i.    JLR's Knowledge of the Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data**

100.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, JLR necessarily would have gained comprehensive and exclusive

---

[19] https://parts.landrovercary.com/oem-parts/land-rover-headlamp-assembly-lr181381?srsltid=AfmBOoqcXfwpBKJk9tXO1OeISEiXFo-zXc5mK47ZEE-F7Arv37ROv3Ho (last visited July 1, 2026).
[20] https://landroverforums.com/forum/2020-defender-60/headlight-failure-led-ring-drl-113207/(last visited July 1, 2026); https://landroverforums.com/forum/2020-defender-60/any-drl-failure-info-welcome-121408/ (last visited July 1, 2026).

knowledge of the Defect in Class Vehicle DRLs, particularly the basic engineering principles behind the construction and function of the DRLs and the modules and heat sinks equipped therein, and the expected conditions and uses the DRLs would encounter in ordinary and foreseeable driving conditions.

101.   An adequate pre-release analysis of the design, engineering, and production of DRLs equipped in Class Vehicles did reveal, or should have revealed, to JLR that the DRLs are defective and susceptible to fail when they otherwise should not. Indeed, given the short lifespan of DRLs in the field, basic design or production validation testing would have revealed the Defect.

102.   Durability testing would have confirmed those findings. Land Rover marketed 2020 and newer Defender models with an emphasis on durability, advertising 200,000-mile lifespans.[21] "The 2020 redesign introduced major upgrades in build quality, powertrain refinement, and in-vehicle tech, reducing many of the legacy reliability concerns."[22] JLR further claimed "[t]he Defender has seen notable gains in reliability, especially in post-2020 models that benefit from tighter quality control and updated tech. While earlier generations had a reputation for being finicky, newer versions have shown more consistent long-term performance and fewer mechanical surprises."[23]

103.   Starting in 2020, JLR also advertised that it increased the rigor of its design and durability testing processes, including a $37 million investment in new testing facilities.[24] JLR claims it "left nothing to chance" when it developed the Defender, putting Class Vehicles through

---

[21] https://www.landroverhenderson.com/how-durable-is-land-rover-defender/ (last visited July 1, 2026).
[22] *Id.*
[23] *Id.*
[24] https://www.automotivetestingtechnologyinternational.com/features/oem-interview-land-rover.html (last visited July 1, 2026).

JLR's "most rigorous testing regime ever," "more than 62,000 tests covering over 1.2 million kilometers."[25] According to interviews with vehicle line director Nick Collins, "[v]erification prototypes, built in the second half of 2018, were put through their paces in 'the most punishing on and off-road environments' Land Rover could find—from the Arctic Circle to Dubai, and even the Nürburgring Nordschleife circuit."[26] These tests did or should have alerted JLR to the Defect's existence.

104.    Given the low mileages at which the Defect typically manifests, JLR's new, extensive, and improved testing processes revealed, or should have revealed, that the DRLs in its Defenders were prone to premature failure.

### ii.    JLR's Knowledge of the Defect from Repair Data

105.    JLR also knew or should have known about the Defect because of the large number of claims for DRL failure and headlight assembly replacements made early in the lives of Class Vehicles.

106.    As many of the exemplar complaints cited below demonstrate, *see infra*, consumers complain that the Defect often causes DRL failure at low mileages and within the warranty period. Numerous reports of DRL failures on the "Land Rover Forum" and the "New Defender Owner" Facebook group, as detailed below, demonstrate that JLR replaced countless failed DRLs under warranty shortly after JLR brought the Class Vehicles to market.

107.    Upon information and belief, JLR, like all vehicle manufacturers, communicates with its authorized service technicians in order to identify pervasive vehicle defects, and root causes and potential repairs. JLR collects and analyzes field data including, but not limited to,

---

[25] https://www.youtube.com/watch?v=buoJfkLc6Fc (last visited July 1, 2026).
[26] https://www.automotivetestingtechnologyinternational.com/features/oem-interview-land-rover.html (last visited July 1, 2026).

repair requests made at dealerships and service centers, technical reports prepared by engineers that have inspected vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data, in order to determine whether a defect exists and should be covered under warranty or through a goodwill program.

108.    JLR's review of data relating to DRL failure early in the life of Class Vehicles undoubtedly revealed to JLR that DRLs are universally defective.

109.    In addition, JLR also reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. JLR dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide JLR with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the defective component in case JLR later decides to audit the dealership or otherwise verify the warranty repair. These data inevitably are replete with examples of JLR's failed DRLs.

110.    For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to JLR because JLR will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described. Due to JLR's efforts to monitor defect trends and the sheer number of repairs and warranty/goodwill requests made in connection with the Defect, JLR knew or should have known of the Defect long before it placed most Class Vehicles into the stream of commerce.

111.    In fact, JLR acknowledged the Defect's existence, and its longstanding knowledge thereof, shortly after it commenced selling Class Vehicles. In July 2021—only 18-months after Class Vehicles were brought to market—JLR released "Special Service Message" No. 75479.[27]

---

[27] https://static.nhtsa.gov/odi/tsbs/2021/MC-10199802-0001.pdf (last visited July 1, 2026).

112.    JLR describes SSMs as "a formal communication issued by Land Rover [that] carries the same importance of a Technical Service Bulletin. An SSM is a quick method of communicating "Need To Know" information to the technical service community." Further, an SSM is typically issued to advise technicians of issues known to "occur on some vehicles, or provides information that could assist in correct vehicle and diagnostic service." Like Technical Service Bulletins then, JLR presumably issues an SSM only when it has accrued sufficient knowledge of a pervasive condition of which authorized service technicians must be made aware in order to promptly diagnose a recurring defect.

113.    According to SSM No. 75479, by July 19, 2021, JLR knew that customers were reporting that Class Vehicles' "Daytime Running Lights are not working or have an intermittent operation…." and ordered technicians to replace the affected headlamp and "hold onto the parts replaced, as engineering may request them to be returned for analysis."[28] The issuance of SSM No. 75479 shortly after Class Vehicles entered the market demonstrates that JLR was tracking widespread DRL failures early in the product lifecycle. The SSM also attaches photos of a Class Vehicle (reproduced below) that had experienced DRL failure and was tendered to a JLR-authorized dealership for repairs.

---

[28] *Id.*

28

## Special Service Message

NOTE: A Special Service Message is a formal communication issued by Land Rover and carries the same importance of a Technical Service Bulletin. An SSM is a quick method of communicating "Need To Know" information to the technical service community. SSM's may be issued in advance of a technical bulletin or may be the only communication on a given topic. All information contained in Land Rover technical communications are intended for use by trained, professional technicians with the knowledge, tools, and equipment required to complete the procedure correctly and safely. It informs the Technicians of conditions that may occur on some vehicles, or provides information that could assist in correct vehicle and diagnostic service.

SSM 75479 - L663 20-21MY - Front Daytime Running Light(s) Are Not Working / Intermittent Operation

**Models :** Defender/L663

**Engineer Name :** Chris Davies

**Last Modified :** 19 JUL 2021 14:48:48

**Category :** Electrical

**Symptom :** 201000 Lighting Systems

**Content : Issue:**

JLR is investigating front Daytime Running Lights are not working or have an intermittent operation (see images attached).

**Cause:**
Unknown at this time.

**Action:**
Please carry out the following;

- Confirm the vehicle symptom as reported by the customer

- Highlight the DTCs and attach all the information identified plus the session file(s), photograph(s) and video(s) to an ePQR

- Please replace the affected headlamp with the applicable part from JLR EPC and hold onto the parts replaced, as engineering may request them to be returned for analysis.

Thank you in advance for your assistance with this matter.

**File :** L663_DRL_Inop_Image.JPG
L663_DRL_Inop_Image_Close_Up.JPG

Jaguar Land Rover Limited 2000 - 2020 (Rel. 2691A)

Figure 8: SSM 75479 issued by Land Rover regarding failures in the DRL in the Class Vehicles.[29]

---

[29] https://static.nhtsa.gov/odi/tsbs/2021/MC-10199802-0001.pdf. (last visited July 1, 2026).



Figure 9: Photo of vehicle exhibiting DRL failure attached to SSM 75479.

114. That JLR had accrued knowledge of the Defect long before it issued SSM No. 75479 in July 2021 is confirmed by the timing of JLR's efforts to redesign the DRL in response to failures reported shortly after Class Vehicles came to market.

115. Class Vehicles originally came equipped with headlight assemblies identified by Original Equipment Manufacturer (OEM) Part No. LR130009. OEMs change part numbers only when they have undertaken engineering revisions to a part, usually to update internal electronics or implement reliability or manufacturing improvements. Part revisions are a time intensive process that require engineering analysis, part design and production validation testing, and internal approval, as well as for the supplier to adjust any tooling, all before a new part can be produced for production or vehicle service.

116. Based on the pre-filing investigation of counsel, in mid-2021, either shortly before or around the time it issued SSM No. 75479 in July 2021, JRL introduced a redesigned headlight assembly for Class Vehicles, identified by OEM Part No. LR144293. Given the time and cost

involved in redesigning a vehicle component and the timing of SSM No. 75479, JLR undertook to redesign the changes to Class Vehicle headlight assemblies due to knowledge of the Defect that it secured either before or shortly after it brought Class Vehicles to market.[30]

### iii. JLR's Knowledge of the Defect Gathered from the Large Number of Replacement Parts Ordered from JLR

117. Upon information and belief, JLR also knew or should have known of the Defect because of the higher-than-expected number of replacement headlight assemblies ordered from JLR, which should have alerted JLR to this systemic and pervasive Defect in Class Vehicles.

118. JLR service centers use OEM replacement parts ordered directly from JLR. Furthermore, independent vehicle repair shops that service Class Vehicles also order OEM parts directly from JLR. Therefore, JLR has detailed and accurate data regarding the number and frequency of replacement part orders. JLR certainly knew of the ongoing high sales of Class Vehicle replacement headlight assemblies the Defect necessitated.

119. The number of OEM replacement parts ordered from and sold by JLR provided it with significant insight into the Defect's scope because of the nature and expected lifespans of the DRLs and the assemblies in which they are encased. Indeed, Class Vehicle owners report that the Defect is so pervasive that replacement headlight assemblies routinely were on backorder, a fact of which JLR necessarily was aware.[31]

---

[30] These changes did not cure the Defect, as evidenced by customer complaints arising from DRL failures in MY 2022 and 2023 vehicles, and JLR's release of yet another redesigned headlight assembly—OEM Part No. LR18138—sometime after Model Year 2023 production was completed.

[31] *See, e.g.,* https://landroverforums.com/forum/2020-defender-60/daytime-running-lights-117590/ (last visited July 1, 2026) (July 4, 2023 post noting that "dealer said this was the 4th or 5th he'd seen fail in the past few weeks/months. anyway, new one on order, and of course backordered."); (July 4, 2023 post noting that "I was told it was back ordered with estimated wait 4-6 weeks.").

120.   Indeed, Class Vehicle DRLs use LED lighting, which provides tens of thousands of hours of use prior to failure. JLR recognizes that well manufactured and/or designed LED lights do not require replacement at regular intervals, and thus does not recommend that its technicians replace headlight assemblies at regular intervals.

121.   As a result, the sheer number of replacement headlight assemblies ordered by dealers and third parties alike did alert, or should have alerted, JLR to the Defect in Class Vehicles.

### iv.   JLR's Knowledge of the Defect Gained from Class Member Complaints Made Directly to JLR

122.   JLR also knew or should have known about the Defect because numerous consumers complained directly to JLR regarding premature DRL failure. The large number of complaints, and the consistency of the descriptions of the DRL failures in the Class Vehicles, should have alerted or actually alerted JLR to this serious Defect affecting a wide range of its vehicles. Below is a sampling of complaints by drivers who reported DRL failures to JLR dealers and were told by dealer representatives that it is an issue known to JLR.

| Model Year | Post Date | Comments |
|---|---|---|
| 2022 | July 4, 2023 | "Just FYI on this. my driver side DRLs stopped working this weekend. 2022 p400 with about 21K miles on it. dealer said this was the 4th or 5th he'd seen fail in the past few weeks/months. anyway, new one on order, and of course backordered. i did mention it would be nice if JLR pushed an OTA update to give us the option to turn off the DRLs and even asked if they would do it for me while they were inspecting, but they kinda shrugged off my comments. anyway, guess i'll be winking at everyone for a while ;-)"[32] |
| 2020 | July 14, 2023 | "FWIW, My left hand side went out back in January and took my dealer aprox. 3 months to get me a replacement, but just because I complained A LOT with JLR Customer service and with the GM of my dealer. Replaced back in April and every time I looked at the passenger side one I got the chills in |

---

[32] *Id.*

| | | thinking it would kaputz right after my warranty expires.<br><br>Lo and behold, yesterday driving to work passenger side goes out right after the indicator stops blinking. Called my dealer and set an appointment for this morning. Went in today just hoping to confirm failure and get the part ordered for another 3 month wait. Surprise when I got there, my SA went to check and they had it in stock. Do you want to leave the car to replace? Hell yeah! Just got the call and all replaced and car ready for pick up.<br><br>All of this to say, my guess is that there are so many of these failures that JLR may be getting up to speed with their suppliers and the wait times are reducing - hopefully you guys are as lucky as I was. There is hope this parts shortage will end sooner now."[33] |
|---|---|---|
| 2020 | July 30, 2023 | "After having my passenger side finally replaced in May, our drivers side went out in July. Dealer in Austin said they now have 20-30 lights on hand, so I got it replaced same day, which was nice.<br><br>The Service Manager was really nice and talked with me for a bit and said he had heard that the new lights have updated chip boards that should hopefully prevent them from failing again.<br><br>So who knows, only time will tell."[34] |

123.    The full universe of complaints made directly to JLR concerning the Defect is information presently in the exclusive custody and control of JLR and is not yet available to Plaintiffs. But JLR actively encourages its customers to contact it regarding pervasive vehicle issues.

124.    On information and belief, however, many Class Vehicle owners complained directly to JLR dealerships and JLR itself about DRL failure in Class Vehicles as evidenced by the exemplar Class member complaints transcribed below, and as did Plaintiffs Bilhorn and Plaintiff Khan.

---

[33] *Id.*
[34] https://landroverforums.com/forum/2020-defender-60/daytime-running-lights-117590/ (last visited July 1, 2026).

     **v.**     **JLR's Knowledge of the Defect Gained from Class Member Complaints Made to NHTSA.**

125.    There exist a large number of relevant customer complaints, the collection of which evidence JLR's knowledge of the Defect. These complaints were made when affected vehicles were submitted for service, on the National Highway and Traffic Safety Administration ("NHTSA") Office of Defect Investigations ("ODI") Web site, www.safercar.gov, as well as other customer forums and blogs addressing car defect and safety issues.

126.    Federal law requires automakers like JLR to be in close contact with NHTSA regarding potential auto defects, and imposes a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

127.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, JLR knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints that alerted, or should have alerted, JLR to the Defect. On information and belief, Defendants' Customer Relations division is responsible for monitoring in real-time, inter alia, complaints filed by consumers with NHTSA ODI.

128.    The following are examples of the many complaints concerning the Defect available through NHTSA ODI's Web site, www.safercar.gov. The complaints reveal that Defendants, through their network of dealers and repair technicians, were made aware of the

34

Defect. In addition, the complaints indicate that despite having knowledge of the Defect and the exact vehicles affected thereby, Defendants and their agents refused to diagnose the Defect or attempt to repair it while the Vehicles were still under warranty. The comments reproduced below are but a sampling of available complaints:

| Model Year | Complaint Date | Notes |
|---|---|---|
| 2020 Land Rover Defender | December 22, 2023 | Daytime running lights stopped working with no warning signs or notifications, reducing visibility.. Has been confirmed by independent service center. Circuitry in headlight is known to fail causing the daytime running light to stop without warning |
| 2020 Land Rover Defender | April 12, 2024 | Daytime running light failure. Making vehicle difficult to see. Dealer lists and a knows issue and and flagged as a safety concern. But refuses to repair or rectify the problem. And wants to charge over $4000 for a safety item. |
| 2020 Land Rover Defender | August 1, 2024 | This is a 2020 Land Rover Defender 110. The daytime running lights on the headlamp need replaced. I had replaced the passenger side a few months ago at the Land Rover dealership while the car was still under warranty at 49,500 miles. Now, the Land Rover has 55k miles and the driver side has gone out and the Land Rover Dealer has quoted me 3K to fix this. This is a common problem and many owners with the years 2020-2023 are experiencing the same problem. This should not be happening with LED lights with such low mileage on the Defenders. This is a safety issue and this model should be recalled. Yes, the dealer has confirmed the problem with the daytime running light on the headlamp. There were no warning lamps or messages with this failure. |
| 2020 Land Rover Defender | April 16, 2025 | The LED daytime running light failed on my vehicle and the dealer needed to replace the entire headlight unit. The manufacturer wanted to charge $2,500 for the replacement. There must be something faulty in the design of these headlights as out of 156 people I surveyed with Defenders, I've heard of 55 who have had this same issue, 7 who have had their daytime running light and headlight fail, 87 who have not had the daytime running light issue yet, and 7 respondents do not have the LED headlights and have not had their daytime running issue. This seems to be a manufacturer defect. |

| | | |
|---|---|---|
| 2020 Land Rover Defender | June 16, 2025 | The daytime running lights which also dim the overall lights at night, also known as the halo LED light continues to malfuction. I bought this car (2) years ago and I'm now on the second set up LED running lights. There are numerous other reports of this malfunctioning across owners. multiple online forums. this overall poses a large saftey hazard as the light is very dim at night from it not running, also including the daytime light casuing saftey issues for other cars. |
| 2020 Land Rover Defender | June 20, 2025 | Mileage at time of failure: ~27,500 miles The signature LED headlamp assembly on my 2020 Land Rover Defender 110 X has experienced a failure of the integrated Daytime Running Light (DRL) module. The DRL has gone completely dark and is no longer functioning. This failure occurred shortly after the expiration of the factory warranty and affects a key visibility and safety feature of the vehicle. The only available repair, according to the dealership, is full replacement of the headlamp assembly at a cost of over $3,000. The DRL cannot be serviced independently. This is an unreasonable cost for a low-mileage vehicle and a safety-critical component. This appears to be a widespread issue affecting 2020–2022 Defender models, with numerous reports online from other owners citing identical DRL failures. This suggests a systemic design or quality defect in the headlamp assembly. A DRL failure undermines the vehicle's visibility to other drivers and reduces safety during daylight driving. Given the high cost of repair and the frequency of reported failures, I believe this defect warrants investigation and potential recall action. |
| 2020 Land Rover Defender | September 13, 2025 | The Daytime Running Lights (DRL) stopped working. The biggest hazard of DRL failure in a 2020 Defender is reduced daytime visibility to other drivers, which increases accident risk, especially in marginal light conditions. Also, in the Defender, DRLs are LED-based and integrated into the front lighting assembly. A failure could point to wiring, control module, or fuse issues. If ignored, these could eventually affect other lighting systems. The issue has been reported to JLR and I will be taking the car to the dealer for formal diagnostics and report. |
| 2021 Land Rover Defender | July 6, 2023 | This vehicle has been at the dealership for six weeks waiting on both headlamp replacements. Daytime running lights do not function. Intermittent headlamp function. |

| 2021 Land Rover Defender | November 13, 2023 | The passenger side headlight is malfunctioning. The halo and outer bulbs do not come on which disables the daylight running lights and reduces the effectiveness of the headlight at night. There is no warning light or message indicating the failure. The vehicle has been inspected by the manufacturer's dealer and they confirmed that the headlight is faulty. I feel like this issue should be repaired by the manufacturer and at their expense. My research has shown that this is a common issue in this vehicle and is reason for a recall. |
|---|---|---|
| 2021 Land Rover Defender | January 20, 2025 | 1. The driver side DAYTIME Running Light has failed as of 1/20/25. 2. Some states require the DAYTIME RUNNING LIGHTS to be operating. (So, I need to replace this headlamp.) 3. Three auto repair companies have confirmed the DAYTIME RUNNING LIGHTS are not operating and the entire headlight will need to be replaced. 4. No warning lights are available for the Daytime Running Lights. I found the issue while observing the front headlights of the Defender. 5. The issue is that I have been told by 3 different auto repair companies that numerous Defenders have the same issue. The Daytime Running Lights have failed and the entire Head Lamp has to be replaced. 6. The auto techs say this seems to be a BAD SUPPLY CHAIN and the issue should be addressed by Land Rover. This is due to so many Defenders having the same issue. 7. In addition, I was told by every auto company that the passenger side DAYTIME RUNNING LIGHT would be going bad anyday because these headlamps are a problem on Defenders. 8. Land Rover has told me I will have to pay around $4,000 and up to $5,000 to have Land Rover replace the entire HEAD LAMP that has failed on many 2021, 2022, and 2023 Defenders. 9. This is WRONG when Land Rover Defenders have so many Daytime Running Lights Head Lamps going out. There is a BAD SUPPLY CHAIN problem I believe just like the auto techs have told me. 10. I firmly believe some Defenders owners don't even know their Daytime Running Lights are out. It takes you actually checking out the front of your vehicle and noticing the head lamps. (Also, some owners just have the head lamp replaced and write the check.) Please help me with Land Rover replacing this headlamp with a headlamp that doesn't have issues. Land Rover North America should be held responsible for this common Daytime Running Light problem. |

| 2021 Land Rover Defender | October 6, 2025 | The halo headlight went out, and I have an extended warranty that supposedly doesn't cover it. After researching, this seems to be a national event. The headlights need to be recalled and the manufacturer needs to be held accountable. |
|---|---|---|
| 2021 Land Rover Defender | November 19, 2025 | The daytime running lights (DRL) have failed in the passenger side. After some quick research, it's apparent that this is a widespread issue with the "Signature" halo lights in the Defender headlamp assembly. Reddit discussion: [XXX] ) Here is a Youtube video showing the issue and "fix". So many people have had this same issue that this guy figured out the problem: [XXX] ) The original warranty would have covered it but my warranty just expired earlier this year and the extended warranty will not cover it. The dealership is telling me that the entire headlamp assembly will need trashed and replaced all because this small "chip" within the unit has failed. The cost to repair is close to $3,000. Seeing that the issue causes the DRL's to fail which could lead to a failed vehicle inspection, the issue should be reported more widely and a recall should be issued. Thank you for your time! INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) |
| 2021 Land Rover Defender | February 2, 2026 | Both daytime running lights failed simultaneously. Not covered by warranty and told that they would cost >$5,000 to repair. There have been hundreds of these reported and it should be a recall |
| 2022 Land Rover Defender | October 21, 2023 | Vehicle daytime running lights burn-out prematurely, after about a year or two. Common issue - Land Rover often will replace the entire headlight only for the lights to burn out again. This is happening so often Land Rover headlamps are months back-ordered. See this thread: [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) |
| 2022 Land Rover Defender | December 1, 2023 | The Daytime Running Headlights have gone out once again. This is such a common issue with the Land Rover Defenders yet, the manufactures force the customers to pay $3000 to $5000 to replace. Police will pull you over for this issue ask they think you headlight is completely out. |
| 2022 Land Rover Defender | August 12, 2024 | The headlight/daylight running lamps are known to burn out on these. Mine has burnt out and wont go back on. These are LED's where the LED is not going bad but the LED assembly is getting too hot and burning |

38

| | | |
|---|---|---|
| | | itself out. This is know issue with LandRover (they even have a special service bulletin [XXX] ) but they are not fixing the problem on vehicles but forcing customers to simply buy new headlights at their expense. Upon further review online, there are hundreds of complaints about this same issue. Land Rover is replacing if under warranty but leaving everyone else to pay approximately $5,000 for a new headlight. This is not only unsafe but irresponsible for them to not step up and make a fix of this issue. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) |
| 2022 Land Rover Defender | February 4, 2025 | I own a 2022 Land Rover Defender and the front lights have both burned out. The issue is the running day lights burn out and the ONLY fix is to replace the entire headlight. The cost of replacing the headlight is over $3,000 and has happen to both headlight in my 3+ year old car. This is a safety issue because the running day light need to be used in order to property see the vehicle and use the turn signals. I have spoken to the dealership and looked online in Land Rover forums and this is a very common problem. I'm requesting a recall on the headlights for the Defender and also recommend that their should be a fix that does not cost over $3,000 when a simple LED has burned out. Thanks for your Athenian to this issue. |
| 2022 Land Rover Defender | February 2, 2026 | Daytime running lights has failed on the front headlights and follows pattern similar to known Special Service Message 75479. This reduces safety due to lower visibility since the DRLs should operate during normal driving conditions. I have reached out to the dealer and the Land Rover Corporate, both of which refuse to fix the issue unless I pay for parts and labor (est cost $5000+). This issue is dangerous since there is no indication on the dashboard or other warning unless the headlights are manually inspected while the vehicle is operatin |

### vi.    JLR's Knowledge of the Defective DRL Headlights from Class Member Complaints on Third-Party Websites

129.    In addition to responding to complaints made directly to JLR by customers who tendered their vehicles to JLR and its agents for repair, such as Plaintiffs and many of the

complainants referenced above, upon information and belief, JLR agents routinely monitor the Internet for complaints similar in substance to those quoted below.

130.   A popular forum for Land Rover owners is the Land Rover Forum (www.landroverforums.com), and the board is rife with complaints about premature DRL failures from owners of Class Vehicles. Further, upon information and belief, JLR monitors this forum through the handle "The Insider," who identifies themselves as a "fellow on the inside of Land Rover" and makes posts on behalf of JLR.[35]  A sampling of posts detailing owners' experiences with DRL failures is provided below:

| Model Year | Post Date | Comments |
|---|---|---|
| 2020 | September 10, 2021 | Just had the driver side semi-circular halo DRL go out. The two square DRLs and all other headlight feature work. Any thoughts? Will call dealer on Monday, but just checking to see if anyone else has had a similar issue.[36] |
| 2020 | August 4, 2022 | I recently had the LED ring and squares on the passenger side fail. The dealership ordered a replacement headlight and replaced it (took a month). It was replaced on Tuesday. Now 2 days later the driver's side has had the same thing happen. I'm hoping this is just a software issue rather than it actually being the headlight. Seems to coincidental.[37] |
| 2020 | August 5, 2022 | Yup. I have an appointment on the 25th for replacement. The dealer questioned it initially asking are you sure nothing hit it? If you did it's an insurance claim not a warranty claim... maybe it's cracked or broken as these things don't typically just stop working. I said no nothing hit this, this is almost surely electronics. I said I've already had rear tail lights stop working on this vehicle like six months ago that you fixed and said it was a controller not the physical lights.<br><br>I'm thinking to myself you're kidding with me right? this is a Land Rover. lol Umm, yes things that typically don't |

---

[35] https://landroverforums.com/forum/members/the-insider-87180/ (last visited July 1, 2026).
[36] https://landroverforums.com/forum/2020-defender-60/driver-side-drl-halo-out-108105/. (last visited July 1, 2026).
[37] https://landroverforums.com/forum/2020-defender-60/headlight-failure-led-ring-drl-113207/.(last visited July 1, 2026).

| | | |
|---|---|---|
| | | stop working for no apparent reason actually do just stop working. So when I brought it in (keep in mind it's several weeks to get a service appointment) they took a look while I waited, dropped the bumper, chased wires and finally said it needs a new headlight which will take probably a month or more to get. Ok. A week later I get a call and they have the part which is cool of course but the closest service appointment when I can leave it is you guessed it a few more weeks away. So we'll see how that goes.<br><br>What I worry about now is they ordered the light but perhaps aren't really sure what's wrong and if this 'controller' piece isn't built-into it (maybe it is) then replacement might not even fix it. In the grand scheme of things it's covered under warranty but it's like how many times do you want to go back and forth for various issues? Half the issues I've had they haven't been able to pin down and fix yet , there's other ones like the a-pillar crackle that I'd have to be retired or a masochist to have enough time on my hands to bring back and forth to the dealership while they guess at how to fix it over the course of months not weeks. I didn't pay this much money so I can start working a 'third' job. I have enough crap on my schedule as it is. The other thing I worry about now after reading your post is after they replace the one side even if that works then the other side might start acting up. Ugh I do hope I've traded it in by then.[38] |
| 2020 | January 29, 2023 | Both of mine went out last year, within a couple of months of each other. The first - driver side - failed at 49K miles so was still replaced under warranty,, the passenger side was on my dime, though. Dealer gave me a $4k quote to replace it, even though my warranty has expired just weeks before. Typical Land Rover dealer goodwill that we all love. I found a used one in excellent conditions on eBay for about $800 and replaced it myself in 15 minutes, still a lot of dough for a single headlamp but it felt like a gift by comparison, and luckily it's a plug and play part, no coding or programming required if it comes from another vehicle. Been over a year and so far both of then are still working, but I am not hopeful for the long term based on my experience.<br><br>If anyone wants to match the burned out halo on their driver's side headlamp, I have an otherwise perfectly |

---

[38] *Id.*

| | | |
|---|---|---|
| | | functional passenger side with burned out halo still in my garage, free of charge (only the half-moon headlamp halo is out by the way, somehow the two turn signal "square halos" are still working.) 😉 [39] |
| 2022 | July 4, 2023 | Just FYI on this. my driver side DRLs stopped working this weekend. 2022 p400 with about 21K miles on it. dealer said this was the 4th or 5th he'd seen fail in the past few weeks/months. anyway, new one on order, and of course backordered. i did mention it would be nice if JLR pushed an OTA update to give us the option to turn off the DRLs and even asked if they would do it for me while they were inspecting, but they kinda shrugged off my comments. anyway, guess i'll be winking at everyone for a while ;-) [40] |
| 2020 | July 5, 2023 | It is very concerning seeing a 2022 model having this issue. My halo was also shot (driver's side too) but my car is a 2020 and one would think LR had resolved that in the later production models. I guess not... 😫 [41] |
| 2021 | July 7, 2023 | Good evening everyone, new to the thread but I have had my Defender since March of 2021. Just a quick synopsis, I bought mine in Germany when I was stationed but have since moved back to the states. I had my passenger DRL go out last year August and had it replaced and now my driver's side went out about two months ago and it's still on backorder, still waiting, hopefully it comes in soon. I too wish there was an option to turn off the DRLs if we chose to. [42] |
| | July 30, 2023 | After having my passenger side finally replaced in May, our drivers side went out in July.<br><br>Dealer in Austin said they now have 20-30 lights on hand, so I got it replaced same day, which was nice.<br><br>The Service Manager was really nice and talked with me for a bit and said he had heard that the new lights have updated chip boards that should hopefully prevent them from failing again.<br><br>So who knows, only time will tell. [43] |

---

[39] *Id.*

[40] https://landroverforums.com/forum/2020-defender-60/daytime-running-lights-117590/ (last visited July 1, 2026).

[41] *Id.*

[42] *Id.*

[43] *Id.*

| 2020 | Apr 11, 2024 \| | 2020 Defender 1st Gen. Both DRL's were happy day before yesterday. Now the drivers side flashes when the car powers up, then goes and stays out. NO further flashing or sign of live. This is quite common in the US as I was talking to a pal living in Ohio this morning. He and his wife have Defenders and both cars have had ALL DRL's fail one after the other within a month and half of each other. Is is a complete headlamp assembly thats needed as I find no LED bulb rerplacament listed. Thank you for any help.[44] |
| 2021 | Apr 11, 2024 \| | Yes, this is a common issue, especially with the early cars. My '21 110 S had the driver's side DRL go out back in Feb. and a new headlight assembly was installed under warranty a couple days later. I'm actually surprised that it took that long for one of the originals to go out. I'll definitely purchase an extended warranty, as a new headlight is over $5k a piece.[45] |
| 2020 | Apr 12, 2024 | I have a 2020 that had both DRL out. I had them repaired at an independent shop and they replaced the chip with an aftermarket one ($25 chip). So far so good. There are many headlight repair companies that will do the job. The job may run you around $600 a piece, much better than 5k apiece, or follow Simon's guidance![46] |
| | May 18, 2024 | Agreed. Although the OEM chips only seem to last a year or two and a new headlight is $3700.[47] |
| 2020 | Aug 26, 2024 | The DRL ring failing is a common issue. I had mine replaced under warranty 2 years ago. The driver's side ring just failed again at 70k miles. There is a fix for this. You can buy the part from Powerful uk, it's £48. They did a video on replacing the LED module. They also said you can't separate the headlight lens from the casing. That is false. I just did this with a heat gun and patience. Here is a link to the part on their website and their video showing where the part goes. I used black silicon/caulk to reassemble the headlight.<br>* * *<br>In the video, they just cut it off with a Dremel and didn't try to separate the lens from the casing. I was a little surprised by that, but they have lenses and cases, so I don't blame them. I used a heat gun and heated the area where |

[44] https://landroverforums.com/forum/2020-defender-60/any-drl-failure-info-welcome-121408/ (last visited July 1, 2026).
[45] *Id.*
[46] *Id.*
[47] *Id.*

| | | |
|---|---|---|
| | | the seal was. I went around the seal lots of times to warm it up steadily. I then used a flat head screw driver and plastic/nylon blade to work into where the seal was and also to pry the lens and casing apart. There are tabs along the casing that the plastic lens clips into. I heated those areas separately and pulled the slightly melted casing away from the lens so those clips wouldn't stop the lens coming out. On reinstall, I heated those tabs and pushed them back into place. If you have a hook shaped pick, that would help break the seal if you run it along the seam (I didn't think of this until after I had it apart and saw how they were connected). I ended up working the one end loose and prying between the lens and the case. I kept heating each side of the seal and prying up little by little working toward the other end. Once they separated, I scraped all the seal/gunk off the lens and from in the seam of the case.[48] |
| 2020 | August 26, 2024 | Any insight or anticipation on actions JLR is taking towards the LED headlight failures? I saw three Defenders today, two of which had the driver's side halo out. Not only is this an inexcusable failure on a vehicle this expensive, but it presents a legitimate safety issue for those impacted. And, in some localities, you are left with a vehicle you are unable to legally drive for the 2+ months it reportedly takes to get these replacement units in.<br><br>This seems to be a rising problem for those of us with some miles on our vehicles, and I'm sure I'm not alone in being nervous a $4,000+ repair bill will come my way as I approach the end of factory warranty. I have read numerous reports on Facebook groups of JLR refusing coverage applications on these headlights and this has me concerned.<br><br>I feel other widely shared issues, such as the windshields, are more a product of the vehicles geometry - however the headlights inarguably represent an engineering failure. As cases continue to show up, what is the likelihood we will see a recall in any official capacity?<br><br>Tagging @The Insider in hopes of some insight or color here.[49] |

---

[48] https://landroverforums.com/forum/2020-defender-60/headlight-failure-led-ring-drl-113207/ (last visited July 1, 2026).

[49] *Id.*

44

| 2021 | August 28, 2024 | my drivers side went out at like 60k dealer wanted 4500 plus labor. I Ordered the light modules online I think I paid $50 for 2. I put the light in the oven to soften the sealant popped it apart swapped the module added new sealant put back in oven pressed leans cover back on then back in the oven. 4 months gone by plenty of hard rains and car was or 2 since i usually hand wash. no leaks or condensation. parts department told me to make sure I use butyl sealant thats what OEM is bought from amazon. tanke your tiem doign this you dont want to crach the housing or lens.[50] |
| --- | --- | --- |
| | Dec 12, 2024 | Why not just buy the LED modules for $50 a set and spend an hr or so fixing it yourself? You could have saved $450 to put toward mods. More if you count the repair cost. JLR won't repair it. They only replace at $4k ea. (when you are out of warranty). I laughed at the service guy when he told me the price. I fixed it for less than $75 if you include new headlight sealant. in less than 2 hrs.[51] |
| | May 26, 2025 | 110 has common daytime running lights problem, like BMW, Mercedes and Audi. My father, elder brother and I have 110, the DRL all have problems.<br><br>The previous friends mentioned replacing the used headlight assembly to solve this problem, but I don't recommend it, because the used headlights will also have the same DRL problem. For example, my father used an used headlight, and it not working less than half year.<br><br>Now his car and my car use antparts LEDs, and my elder brother uses Simon one. More then one year and it working fine so far so good.<br><br>I think it is flaw in the headlight design. The DRLs do not dissipate enough heat. LEDs only rely on a small aluminum to dissipate heat, and DRL inside the headlight.[52] |
| 2022 | October 25, 2025 | 2022 running headlight DRL out at 48k miles.[53] |

---

[50] *Id.*

[51] https://landroverforums.com/forum/2020-defender-60/any-drl-failure-info-welcome-121408/ (last visited July 1, 2026).

[52] *Id.*

[53] https://landroverforums.com/forum/2020-defender-60/2022-running-headlight-drl-out-48k-miles-127058/ (last visited July 1, 2026).

| 2020 | October 25, 2025 | mine is out- I have 2020 Defender with 96,000 miles on it- they want over 4000$ to replace headlight- the main high/low is working so I'm passing.[54] |
|------|------------------|-----------------------------------------------------------|
| 2020 | October 25, 2025 | Seems like JLR should be replacing every one of these gratis -- or for cost of labor only -- for Defender owners and sending the bill straight back to the supplier / headlamp manufacturer who should be bending over backwards to retain JLR's business.<br><br>Yet they are not doing this. Puzzling really.<br><br>It's not JLR's fault. It's the supplier's fault. But how they are handling it -- is JLR's fault.<br><br>And it reflects poorly on the brand to see at least 25% of Defenders driving around town with one of the DRL's burned out. Which is definitely the case right now in Portland OR.<br><br>(mine died with 28500 miles on mine. right outside the 4 year warranty. denied. unhappy. im just running it without the DRL).[55] |

131.    The failures are also discussed on another popular online forum, defender2.net,

which is primarily geared towards UK owners of Land Rovers, as detailed below:

| Model | Post Date | Comments |
|-------|-----------|----------|
| L663 | May 13, 2023 | My driver's side DRL has stopped working on my Defender 90. I presume this is a dealer fix but does anyone know what is involved? Is it a replacement unit and if so, are they generally in stock these days?[56] |
| L663 (2025) | May 13, 2023 | Our MY2025 goes in this week for its service and complete replacement of the near side headlamp unit due to the DRL halo failing.. known issue it seems ..[57] |
| L663 (2020) | June 9, 2023 | on my 2020, the passenger side DRL died a couple of months ago. The day before it was replaced at the dealer, the drivers side died. So I went from one side dead to the other side dead for months, since the driver side won't be available until July. |

---

[54] *Id.*

[55] https://landroverforums.com/forum/2020-defender-60/2022-running-headlight-drl-out-48k-miles-127058/ (last visited July 1, 2026).

[56] https://www.defender2.net/forum/post992498.html (last visited July 1, 2026).

[57] *Id.*

| Model | Post Date | Comments |
|---|---|---|
| | | Fortunately, both under warranty, given the absolutely absurd cost for a headlight and complete lack of serviceability.[58] |
| L663 | November 13, 2024 | My car is 10 months out of warranty and I didn't take out extended warranty.<br><br>Recently the left hand headlamp drl went out. New headlamp required. Also front parking sensors packed up.<br><br>Took it to Williams JLR in Stretford who have repaired the car. Good news is Land Rover contributed 80% of the total invoice.<br><br>Just posting in case others have same issue. It's fairly common on early cars.[59] |
| L663 (2023) | September 7, 2025 | I read in a few owners groups DRL halo failing was happening in vehicles up to MY23 models, I wonder if LR managed to fix it on later models? I have had both headlights replaced under warranty due to the DRL going, and with the warranty being up the end of the month, fingers crossed the new ones are more reliable or ut will be a powerful UK fix to save money[60] |

132.    The "New Defender Owners" Facebook group is also rife with complaints regarding premature DRL failures:

| Model | Post Date | Comments |
|---|---|---|
| 2020 | November 7, 2025 | Has anybody fixed their own DRL halo chip in the headlight? My landrover 2020 110 DRL Halo on one side wasn't working and I just opened and replaced the chip but still doesn't turn on. Light tube looks fine. New entire unit sucks out of warranty! Thoughts?[61] |
| 2020 | September 4, 2025 | My wife and I own two 2020 Defenders. We have had to replace entire headlight assemblies 4 times because the LED halo failed. Today I noticed one gone again. They cost approximately $4000 each time which is |

---

[58] https://www.defender2.net/forum/post1074995.html (last visited July 1, 2026).

[59] https://www.defender2.net/forum/post1052049.html#1052049. (last visited July 1, 2026).

[60] *Id.*

[61] https://www.facebook.com/groups/237187392234742/posts/836844192269056/ (last visited July 1, 2026).

| | | |
|---|---|---|
| | | unconscionable. How many others in the group are fed up with this? There should be a recall and as well a redesign to be able to replace the chip easily. Comments please. 😡[62] |
| 2023 | September 7, 2025 | I have a similar issue for my 2023 defender, both failed around the same time. A guy from UK has a channel on youtube where he has all the parts listed and a video on how to change the circuit board. I think the board was around £70 each.[63] |
| 2022 | September 4, 2025 | Totally agree! Both of mine went. First one was on warranty and the second one wasn't. I just paid close to $5k for a new assembly and a replacement for the coolant sensor issue I had as well. It was a 2022, 4 years old with 115,000kms. I heard there's a workaround to just buy the chip/board that controls the LED from a UK company but it requires some extensive tinkering I'm not capable of. I just traded mine in right after these fixes on a 2026 Nissan Armada Pro4X. I'm sure I will miss lots about the defender but I was ready for a larger vehicle (8 seater) with equal towing capacity.[64] |
| 2020 | September 4, 2025 | My 2020 has 27,500 miles on it and one has gone out. No bueno. That's kinda pitiful!![65] |
| 2021 | December 21, 2025 | My defender 2021 running lights out. Anybody tried replacing module as posed to replace complete headlamp as LR suggest.[66] |
| 2021 | December 21, 2025 | I'm going to try it shortly as well. My righthand DRL died in April and Land Rover replaced it free of charge but now the left has failed and they are only willing to pay 40%. A new headlight costs nearly 3 grand here in Germany. My dealer tells me that nearly 80% of defenders are effected with this issue and Land Rover won't stand by it.[67] |

[62] https://www.facebook.com/groups/237187392234742/posts/782652287688247/ (last visited July 1, 2026).
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] https://www.facebook.com/groups/237187392234742/posts/870533255566816/ (last visited July 1, 2026).
[67] *Id.*

48

133. Upon information and belief, JLR agents carry out this function of monitoring online forums in addition to receiving and responding to customer calls concerning, *inter alia*, product defects. Through these sources, JLR was made aware of the Defect.

134. In sum, as early as 2020, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, JLR was aware, or should have been aware, of the Defect, and/or was negligent in failing to be aware of the Defect, based on, among others, the following sources:

    a. Pre-release design, manufacturing, engineering, and testing data;

    b. Detailed data gathered by JLR about large number of Defect repairs;

    c. Knowledge JLR had of the large number of replacement headlight assemblies ordered from JLR;

    d. Numerous and consistent consumer complaints made directly to JLR about the Defect;

    e. Numerous and consistent consumer complaints collected by NHTSA ODI about the Defect;

    f. Numerous and consistent consumer complaints made on online vehicle owner forums; and

    g. JLR service center employees' familiarity with and knowledge of the Defect.

135. Moreover, the large number and consistency of Class Member complaints describing the Defect underscores the fact that Class Members consider it to be a safety issue material to the reasonable consumer

**C.    JLR's Warranty-Related Practices**

136.    JLR issues with every new Class Vehicle a bumper-to-bumper "New Vehicle Limited Warranty" (NVLW) through which it agrees to cure at no charge defects in materials or workmanship that exist within the first four years or 50,000 miles of purchase. An exemplar of the warranty booklet that accompanies every Class Vehicle JLR sold is appended hereto as **Exhibit A**.

137.    JLR also provided Class Members who purchased Certified Pre-Owned Class Vehicles with a 2-year/100,000-mile Limited Warranty or 1-year/unlimited-mile Limited Warranty.[68]

138.    JLR provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

139.    JLR also provides an express written warranty with all JLR replacement parts. The DRLs and the headlight assemblies in which they are encased are covered by JLR's replacement part warranty, which promises that JLR will repair or replace any covered part that was originally installed by a JLR dealership at the consumer's expense.

140.    In order to secure warranty coverage, Plaintiffs and Class members need only tender their Vehicle to a JLR authorized dealership for repairs.

141.    Upon information and belief, JLR dealers have, on occasion, refused to replace or repair the failed DRLs even on Class Vehicles still under warranty.

142.    Even when JLR does replace the headlight assembly, as its warranties require, JLR replaces the headlight assemblies with equally defective replacement parts that likewise are guaranteed to fail prematurely.

---

[68] https://www.jaguar.com/en-us/jdx/certified-preowned/index.html (last visited July 1, 2026).

143.    Thus, when JLR replaces a failed DRL at its own expense, it does so using replacement parts that will eventually require affected Vehicle owners to replace the same assembly in the future at a cost of upwards of $3000. The same light, i.e., the driver's light, or the passenger light, can fail multiple times, subjecting consumers to several thousands of dollars in repairs for the same light over the life of the car.

144.    Because JLR's "fix" is anything but, and merely shifts onto Plaintiffs and Class members the expense of continuously replacing headlight assemblies JLR has long known to be defective, JLR's warranty fails of its essential purpose, and recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they may seek all remedies as allowed by law.

145.    Equally egregious is JLR's refusal to replace both headlight assemblies when only one has failed within the warranty period, and despite knowing both DRLs are guaranteed to prematurely fail.

146.    Moreover, in its capacity as a warrantor, JLR's knowledge of the inherent defects in the Class Vehicles render its efforts to limit the duration of express and implied warranties in a manner that would exclude coverage of the Defect unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void. The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between JLR and Plaintiffs and the other Class members, as, at the time of purchase and lease; Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from JLR.

147.    The limitations on the warranties also are substantively unconscionable. JLR knew that Class Vehicles are defective and would continue to pose safety risks after the warranties purportedly expired. JLR failed to disclose these defects to Plaintiffs and the other Class members

51

while continuing to market Class Vehicles as safe and reliable, thus JLR's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

## TOLLING OF STATUTE OF LIMITATIONS

148. Any applicable statute(s) of limitations have been tolled by JLR's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

149. In addition, even after Plaintiffs and Class members contacted JLR and/or its authorized dealers for vehicle repairs concerning the Defect, JLR and/or its dealers routinely informed them that Class Vehicles are not defective, denied warranty coverage for the Defect, and denied the problem existed.

150. JLR was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality and nature of the Class Vehicles, that the Defect is based on a poor design/poor manufacturing, that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles. As a result of JLR's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

151. Additionally, the Defect is latent and not readily discoverable by reasonable consumers because the DRLs often fail only after years of ordinary use and because consumers reasonably expect LED lighting systems to last for the useful life of the vehicle. Plaintiffs and Class members had no reasonable opportunity to discover that the DRLs were defective until the Defect manifested.

## CLASS ALLEGATIONS

52

152.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

153.     In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure, Rule 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.

**California Class:**

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

**Illinois Class:**

All persons or entities in Illinois who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes.

154.     In addition to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure, Rule 23(c)(5), Plaintiffs also seek to represent the following subclass regardless of whether the Nationwide Class is certified:

**Warranty Denial Subclass:**

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle originally covered by JLR's New Vehicle Limited Warranty or Certified Pre-Owned Warranty, or any other applicable extended warranty, and who presented their Class Vehicles to a JLR authorized dealer following failure of an LED DRL, and were denied replacement or repair.

155.     In the alternative to the Nationwide Warranty Denial Subclass, and pursuant to Federal Rule of Civil Procedure, Rule FED. R. CIV. P. 23(c)(5), Plaintiffs seek to represent the following only in the event that the Court declines to certify the Class above.

**California Warranty Denial Subclass:**

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle originally covered by JLR's New Vehicle Limited Warranty or Certified Pre-Owned Warranty, or any other applicable extended warranty, and who presented their Class Vehicles to a JLR authorized dealer following failure of an LED DRL and were denied replacement or repair.

**Illinois Warranty Denial Subclass:**

All persons or entities in Illinois who are current or former owners and/or lessees of a Class Vehicle originally covered by JLR's New Vehicle Limited Warranty or Certified Pre-Owned Warranty, or any other applicable extended warranty, and who presented their Class Vehicles to a JLR authorized dealer following failure of an LED DRL and were denied replacement or repair.

156.    These classes shall be collectively referred to as the "Class." Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation

157.    Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of JLR and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of Class Vehicles have been sold and leased in the United States.

158.    Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to, whether:

a. The Class Vehicles were sold with a Defect;

54

b. JLR knew of the Defect but failed to disclose the Defect and its consequences to its customers;

c. A reasonable consumer would consider the Defect or its consequences to be material;

d. The Defect renders Class Vehicles unsuited for the ordinary and intended purpose of providing safe and reliable transportation;

e. JLR has breached its express and implied warranties and violated the Magnuson-Moss Warranty Act;

f. JLR's express warranties fail of their essential purpose and/or are unconscionable and unenforceable;

g. JLR should be required to disclose the existence of the Defect and expand its warranty coverage and/or recall Class Vehicles; and

h. JLR's conduct violated state consumer protection statutes.

159.    Typicality: All of the Plaintiffs' claims are typical of the claims of the Class since each Plaintiff purchased a Class Vehicle with the Defect, as did each member of the Class. Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of JLR's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

160.    Adequacy: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the Class(es) they seek to represent, and they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

55

161.   Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by JLR's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, inter alia, JLR's vehicle identification numbers, warranty claims, registration records, and database of complaints.

162.   Whether the DRLs equipped in Class Vehicles are defective is capable of common proof, including whether JLR knew of the Defect prior to sale which can be proven through Defendants' internal records, warranty data, technical communications, testing records, and parts data. Whether JLR omitted or concealed material information concerning the Defect from consumers is likewise subject to common proof.

163.   JLR has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")**
**(Cal. Civ. Code § 1750, et seq.)**
**(On Behalf of the California Class)**

164.    Plaintiff Bilhorn and the California Class incorporate the foregoing allegations as if fully set forth herein.

165.    Defendants are "persons" as that term is defined in California Civil Code section 1761(c). 163.

166.    Plaintiff Bilhorn and the Class are "consumers" as that term is defined in California Civil Code section 1761(d). 164. Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff Bilhorn and California Class members that the Class Vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

167.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

168.    Defendants knew that their Class Vehicles and their LED Daytime Running Lights were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

169.     Defendants were under a duty to Plaintiff Bilhorn and the California Class to disclose the defective nature of the Class Vehicles and the Defect because:

a.   Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles;

b.   Plaintiff Bilhorn and the California Class members could not reasonably have been expected to learn or discover that the Class Vehicles and had a dangerous safety defect until manifestation of the defect;

c.   Defendants knew that Plaintiff Bilhorn and the California Class members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs necessitated thereby until the manifestation of the defect; and

d.   Defendants actively concealed the safety and security defect and the associated repair costs by claiming the Defect does not exist and, in many cases, repairing Class Vehicles using similarly defective LED DRL headlights.

170.     In failing to disclose the Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

171.     The facts concealed or not disclosed by Defendants to Plaintiff Bilhorn and the California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff Bilhorn and the California Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them or would have avoided the extensive repair costs associated therewith.

172.     Under California Civil Code section 1780(a), Plaintiff Bilhorn and members of the California Class seek damages and injunctive and equitable relief for Defendants' violations of the CLRA. Plaintiff Bilhorn notified JLR regarding his intent to file this lawsuit pursuant to California

58

Civil Code § 1782(a), and the undersigned counsel met with JLR counsel to discuss the subject matter of this lawsuit, but JLR did not agree to provide any relief.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE**
**(CAL. BUS. & PROF. CODE § 17200, et seq.)**
**(On Behalf of the California Class)**

173.    Plaintiff Bilhorn and the California Class incorporate the foregoing allegations as if fully set forth herein.

174.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

175.    Defendants have engaged in unfair competition and unfair, unlawful and/or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Bilhorn and the California Class members that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem). Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiff Bilhorn and California Class members could not reasonably be expected to learn or discover the true facts related to this defect.

176.    The Defect constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers as set forth above.

177.    These acts and practices are fraudulent because they have deceived Plaintiff Bilhorn and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiff Bilhorn and the California Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff Bilhorn and the California

59

Class members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Bilhorn and California Class members, as it would have been to all reasonable consumers.

178. The injuries suffered by Plaintiff Bilhorn and the California Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Bilhorn and the California Class members should have reasonably avoided. Therefore, Defendants also have engaged in unfair practices.

179. Defendants' acts and practices also are unlawful because they violate California Civil Code sections 1668, 1709, 1710, and 1750 et seq., and California Commercial Code section 2313. Plaintiff Bilhorn seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business and Professions Code section 17200.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT
### (Cal. Civ. Code § 1797, et seq.)
### (On Behalf of the California Class)

180. Plaintiff Bilhorn and the California Class incorporate the foregoing allegations as if fully set forth herein.

181. Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

182. Defendants were at all relevant times "manufacturers" and sellers of the Class Vehicles under Cal. Civ. Code § 1791(j).

60

183.    Plaintiff Bilhorn and the California Class members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by Defendants.

184.    Defendants expressly warranted the Class Vehicles against defects, including the DRL Defect, as described above, within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

185.    As described above, the DRLs equipped in Class Vehicles, and the headlight assemblies in which they are installed, are defective. The Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff Bilhorn and California Class members.

186.    Defendants knew of the Defect when they expressly warranted the Class Vehicles, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class members that the Class Vehicles had the Defect, and induced Plaintiff Bilhorn and California Class members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

187.    Defendants are obligated, under the terms of their express warranties and pursuant to Cal. Civ. Code §§ 1793.2 and 1795.4, to effectively and within a reasonable time repair the Defect at no cost to Plaintiff Bilhorn and California Class members

188.    Defendants breached their express warranties by supplying the Class Vehicles to Plaintiff Bilhorn and California Class members with the Defect, by failing to provide repairs within a reasonable time, and by replacing defective parts with equally defective replacement parts instead of providing a one-time, effective fix.

189.    Defendants breached their express warranties by failing to repair the Class Vehicles under warranty and by failing to provide to Plaintiff Bilhorn or California Class members, as a

warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiff Bilhorn and California Class members.

190.   As more fully detailed above, Defendants were provided with appropriate notice and has been on notice of the Defect and of their breach of the express written warranties from various sources, including Plaintiff Bilhorn.

191.   Plaintiff Bilhorn has given Defendants a reasonable opportunity to cure their failures with respect to the warranties, and Defendants have failed to do so.

192.   Affording Defendants any further opportunity to cure their breach of written warranties is unnecessary and futile here.

193.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiff Bilhorn and California Class members whole and because Defendants have failed and/or has refused to adequately provide the promised remedies within a reasonable time

194.   Accordingly, recovery by the California Class is not restricted to any written warranties promising to repair and/or correct defects, and it seeks all remedies as allowed by law.

195.   Any attempt by Defendants to limit or disclaim the express warranties in a manner that would exclude coverage of the Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

196.   As a direct and proximate result of Defendants' breach of their express warranties, Plaintiff Bilhorn and California Class members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

197.    Pursuant to Cal. Civ. Code § 1794 and 1795.4, Plaintiff Bilhorn and California Class members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

**<u>FOURTH CAUSE OF ACTION</u>**
**BREACH OF IMPLIED WARRANTY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT**
**(Cal. Civil Code §§ 1792, 1791.1, et seq.)**
**(On Behalf of the California Class)**

198.    Plaintiff Bilhorn and the California Class incorporate the foregoing allegations as if fully set forth herein.

199.    At all relevant times hereto, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

200.    Defendants provided Plaintiff Bilhorn and the California Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold.

201.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by JLR were safe and reliable for providing transportation and would not experience premature LED DRL headlight failure due to a design and/or manufacturing defect; that (ii) a warranty that the Class Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated, and that (iii) the Class Vehicles conform to the promise or affirmations of fact made on the vehicle sticker label.

202. Contrary to the applicable implied warranties, however, the Class Vehicles are not fit for their ordinary purpose of providing safe and reliable transportation because of the Defect.

203. Defendants breached implied warranties applicable to Class Vehicles at the time of sale because the Defect was latent at the time Plaintiff Bilhorn and California Class Members purchased their vehicles.

204. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code sections 1792 and 1791.1

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a)**
**(On Behalf of the Illinois Class)**

205. Plaintiff Khan and the Illinois Class incorporate the foregoing allegations as if fully set forth herein.

206. Defendants are and were at all relevant times "person[s]" as that term is defined in 815 Illinois Compiled Statutes § 505/1(c).

207. Plaintiff Khan and the Illinois Class members are and were at all relevant times "consumers" as that term is defined in 815 Illinois Compiled Statutes § 505/1(e).

208. In Illinois, the "Consumer Fraud and Deceptive Business Practices Act," 815 ILCS § 505/1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the

use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . .

209.    Plaintiff Khan and the Illinois Class members were injured by Defendants' deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff Khan and the Illinois Class members. Because Plaintiff Khan and the Illinois Class members relied on Defendants' misrepresentations, concealments and omissions when purchasing and/or leasing the Class Vehicles, they were injured at the time of purchase and/or lease.

210.    Defendants do business in Illinois, sells and distributes vehicles in Illinois, and engaged in deceptive acts and practices in connection with the sale and lease of the Class Vehicles in Illinois and elsewhere in the United States.

211.    Defendants knowingly failed to disclose, concealed, suppressed and/or omitted material facts regarding the Defect and associated safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Khan and the Illinois Class members. Chiefly, Defendants actively suppressed the fact that its DRLs were prone to premature failure.

212.    Defendants' unfair and deceptive trade practices were likely to deceive a reasonable consumer. Plaintiff Khan and members of the Illinois Class had no reasonable way to know that Class Vehicles contained DRLs that were defective in materials, workmanship, and/or manufacture and posed a risk of premature failure, which constitutes a safety risk. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defect and associated safety risks, and any reasonable consumer would have relied on their misrepresentations and omissions as Plaintiff Khan and members of the Illinois Class did.

213. Defendants had the duty to Plaintiff Khan and the Illinois Class members to disclose the Defect and the defective nature of the Class Vehicles because:

a. Defendants were in a superior position to know the true state of facts about the Defect and associated repair costs in the Class Vehicles;

b. Plaintiff Khan and the Illinois Class members could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous defects until manifestation of the defects;

c. Defendants knew, or should have known, that Plaintiff Khan and the Illinois Class members could not reasonably have been expected to learn about or discover the Defect and its associated repair costs; and

d. Defendants actively concealed the Defect, its causes, and resulting effects, by refusing to acknowledge the Defect.

214. Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Defect were intended to mislead consumers and misled Plaintiff Khan and Illinois Class members.

215. Defendants' violations present a continuing risk to Plaintiff Khan as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

216. As a direct and proximate result of Defendants' violations, Plaintiff Khan and members of the Illinois Class have suffered actual damages and/or injury in fact, including, inter alia: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the failed DRLs; (2) the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the Defect.

217.    Plaintiff Khan and members of the Illinois Class seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Illinois Consumer Fraud and Deceptive Business Practices Act. Plaintiff Khan and members of the Illinois Class also seek an order awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Illinois Consumer Fraud and Deceptive Business Practices Act.

<u>SIXTH CAUSE OF ACTION</u>
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Warranty Denial Subclasses)**

218.    Plaintiffs and the Class incorporate the foregoing allegations as if fully set forth herein.

219.    Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Defendants' warranties are express warranties under state law.

220.    The parts affected by the Defect, including but not limited to the LED DRLs, were manufactured and distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

221.    Defendants breached these warranties by selling and leasing Class Vehicles with the Defect and refusing to honor the warranties by providing free and effective repairs, and by providing ineffective repairs guaranteed to fail.

222.    Any attempt by Defendants to limit or disclaim the express warranties in a manner that would exclude coverage of the Defect is unenforceable and void, because it would be unconscionable to permit Defendants to disclaim a Defect of which they knew prior to selling Class Vehicles while continuing to market Class Vehicles as safe and reliable.

223.    Plaintiffs notified Defendants of the breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants also know of the Defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

224.    As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members incurred substantial repair costs for which Defendants should have borne responsibility pursuant to the terms of their express warranties.

225.    Plaintiffs and the Warranty Subclass members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

226.    Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiffs and Class members whole and because Defendants have failed and/or has refused to adequately provide the promised remedies within a reasonable time.

227.    Accordingly, recovery by the Class is not restricted to any written warranties promising to repair and/or correct defects, and it seeks all remedies as allowed by law.

## SEVENTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY
**(On Behalf of the Nationwide Class or, alternatively, the California and Illinois Classes)**

228.    Plaintiffs and the Class incorporate the foregoing allegations as if fully set forth herein.

229.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the ordinary purpose for which the Class Vehicles were purchased.

230.   Defendants provided Plaintiffs and the other Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, the Class Vehicles suffered from the Defect at the time of sale that causes the LED DRL headlights to fail prematurely. Because Class Vehicles require these lights to be free from defects, the Class Vehicles are not fit for their ordinary purpose of providing safe and reliable transportation.

231.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; that (ii) a warranty that the Class Vehicles would be fit for their ordinary use while the Class Vehicles were being operated, and that (iii) the Class Vehicles conform to the promise or affirmations of fact made on the vehicle sticker label.

232.   On its vehicle labeling, JLR advertises its DRL Daytime Running lights as a safety feature.

233.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from the Defect alleged herein.

234.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for ordinary use.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, et seq.**
**(On behalf of the Warranty Denial Subclass)**

235.    Plaintiffs and the Class incorporate the foregoing allegations as if fully set forth herein.

236.    Congress enacted the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., in response to widespread consumer complaints regarding misleading and deceptive warranties. The Act imposes civil liability on any "warrantor" for failing to comply with any obligation under written and implied warranties. 15 U.S.C. § 2310(d)(1).

237.    The Class Vehicles are consumer products as defined by 15 U.S.C. § 2301(1).

238.    Plaintiffs and Class members are "consumers" as defined by 15 U.S.C. § 2301(3).

239.    Defendants are warrantors and suppliers as defined by 15 U.S.C. § 2301(4) and (5).

240.    Defendants have failed to remedy the DRL Defect despite their knowledge and notice of said defect in the Class Vehicles.

241.    Defendants expressly warranted that their Class Vehicles would be free of defects.

242.    At the time Defendants issued written warranties for the Class Vehicles, they knew and had notice that the vehicles were susceptible to the Defect, including inter alia, (1) damage to the DRLs and assembly; (2) lowered value of Class Vehicles; and/or (3) unsafe driving conditions for consumers and others on the roadways. Defendants' continued misrepresentations and omissions concerning the Defect, as well as their failure to abide by their own written and implied warranties, are "unfair methods of competition in or affecting commerce, and [are] unfair or deceptive acts or practices in or affecting commerce." Accordingly, their behavior is unlawful under 15 U.S.C. §§ 2310(b), 45(a)(1).

70

243.     Plaintiffs and Class members seek to recover damages caused as a direct result of JLR's breach of its written and implied warranties and its deceitful and unlawful conduct. Damages include costs associated with repairing or replacing the Class Vehicles with non-defective vehicles and/or replacement of defective DRLs.

244.     The Magnuson-Moss Warranty Act also provides for "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Accordingly, Plaintiffs and Class members seek reformulation of Defendants' written warranty to comport with their obligations under the Act and with consumers' reasonable expectations. Additionally, Plaintiffs seek to enjoin Defendants from acting unlawfully as further alleged, including discouraging Plaintiffs from seeking all available remedies. The Magnuson-Moss Warranty Act also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2). Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of the case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

A.     determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.     appoint Plaintiffs as Class representatives and appoint their counsel as Class counsel;

C.     award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D.     award pre-judgment and post-judgment interest on such monetary relief;

E.     grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a

minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Defect;

F.      award reasonable attorneys' fees and costs; and

G.      grant such further relief that this Court deems appropriate.


Dated: July 2, 2026                                    Respectfully submitted,

                                                       s/ Bryan L. Clobes
                                                       Bryan L. Clobes
                                                       Daniel O. Herrera*
                                                       Alex Lee*
                                                       **CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
                                                       1350 S. LaSalle St., Suite 3200
                                                       Chicago, Illinois 60603
                                                       Phone: (312) 782-4880
                                                       Facsimile: (312) 782-4485
                                                       bclobes@caffertyclobes.com
                                                       dherrera@caffertyclobes.com
                                                       alee@caffertyclobes.com

                                                       Gary Klinger*
                                                       William J. Edelman*
                                                       **MILBERG PLLC**
                                                       227 W. Monroe Street, Suite 2100
                                                       Chicago, IL 60606
                                                       Tel: (866) 252-0878
                                                       GKlinger@milberg.com
                                                       wedelman@milberg.com

                                                       *pro hac vice forthcoming*